ATTLEBOROUGH NATIONAL BANK *vs.* HARRY A. ROGERS & others.

Suffolk.    June 25. — Sept. 28, 1878.    AMES & ENDICOTT, JJ., absent.

In an action for money had and received. to which the answer was a general denial, it appeared that the defendants, a firm of brokers, sent to the plaintiff, a national bank, certain promissory notes, ordered by its president and a director, for the amount of which its cashier returned a check to them; and the question was whether the plaintiff purchased the notes or had the option to buy them or not, as its board of directors should decide. The directors refused to purchase the

notes. The defendants offered to prove that national banks bought commercial paper, which their presidents were authorized by usage to purchase, and requested the judge to rule that, even if the plaintiff had such option, the action of its cashier completed the sale. The judge rejected the evidence, refused so to rule, and, by consent of parties, before verdict, reported the case to this court, upon an agreement that if the plaintiff could not lawfully buy the notes and the evidence was rightly rejected and the rulings refused, a verdict should be entered for the plaintiff. *Held*, that the question whether a national bank had authority to purchase promissory notes did not arise in the case; and that the question as to the contract between the parties was for the jury.

CONTRACT for money had and received by the defendants to the plaintiff's use. Answer, a general denial.

At the trial in the Superior Court, before *Wilkinson*, J., at April term 1877, it appeared that the plaintiff was a national bank, organized in 1866, under the banking laws of the United States, and that it was in the habit of investing its available funds to a considerable extent in commercial paper. The defendants were brokers in Boston, engaged in selling commercial paper.

On September 27, 1875, the defendants wrote to the plaintiff that they had three notes of C. & M. Cox, describing them, which it could have at a rate named, if desired. The plaintiff had before that time purchased notes of C. & M. Cox of the defendants. On Wednesday, September 29, 1875, Evans, the president, and Whitney, a director of the plaintiff bank, came to the defendants' place of business to get some notes for the bank. They testified in substance that they informed the defendant Rogers that they wished to get for the bank good notes to the amount of about $20,000, and he thereupon produced and made a selection from a large number of notes, remarking that there was a lot of good notes, as they could see from the large number he had selected from; that out of this number they took twelve notes, amounting to between $26,000 and $27,000; that they knew nothing of the responsibility of the makers of any of the notes and relied wholly on Rogers's knowledge concerning it that Whitney then said, "We shall want a few days to decide whether we will keep this paper," to which Rogers assented; and thereupon Evans said, "We shall want until Monday to submit it to the board of directors, as no one has authority to take it without the action of the board, and the board meets on Mon-

day;" to which Rogers replied, "You can keep it until Monday, and return any or all of it, as you like."

Rogers testified in substance that Evans and Whitney came in on Wednesday, September 29, and asked him if they still had the Cox paper, and he told them he had two pieces of it, but that he had sold one; that Evans said, "We will take that;" that he went and brought out the bundle of notes in which were the two Cox notes in question, and took the Cox notes out and handed them to Evans, who took them and placed them one side, saying, "We will take these, any way, and now we want you to select us enough more to make up about $20,000 or $25,000;" that thereupon he selected from his bundle ten notes more, making up the amount to that named, stating to them that the notes were of the best quality, and showing them his sales book, referring to the banks and other parties who had bought notes of this description, and the rates; that he then said to them, "You can have a day or two if you desire, to decide whether you wish to purchase any of this paper or not," referring to the ten notes which he had thus selected; that Evans then said they would like to have until Monday, to which he assented; that no reference was made to their books as to the character of the Cox paper, and nothing was said about it, except to ask for it, and when it was produced to say, "We will take that any way;" and that nothing was said to him then, or on any other occasion, about referring the question of purchase to the board of directors.

Rogers gave the twelve notes thus selected to his clerk to make up the bill according to the rates expressed, and subsequently on the same day Whitney came in and took the notes and bill to the bank. On Thursday, September 30, the cashier of the bank wrote to the defendants a letter inclosing three of the twelve notes, other than the two Cox notes, and a check for the amount of the balance, which letter the defendants received the same day, about 7 o'clock, P. M. At 2 o'clock of Thursday, September 30, C. & M. Cox suspended payment, and their paper went to protest, and certain officers of the plaintiff bank heard of the failure on Friday or Saturday following.

On the Monday morning following, the president and cashier of the bank applied to the defendants to take back the Cox

notes, which they declined to do, the officers of the bank contending that they had the right to return any or all of the notes taken on September 29 on or before Monday, and the defendants denying their right to return the Cox notes. Subsequently on that morning they asked the defendants if they would take back the rest of the notes, and the defendants told them they would.

In the afternoon of Monday, the board of directors of the bank, for the first time as a board, acted upon the nine notes retained out of the twelve taken, and refused to take them; and thereupon the cashier, under the instructions of the board, inclosed the notes, including the two Cox notes, in a letter to the defendants, informing them of the action of the directors, to which the defendants replied, returning the Cox notes. The plaintiff put in evidence, against the defendants' objection, a by-law of the bank, as follows: "There shall be a standing committee, to be known as the exchange committee, consisting of the president and two directors, appointed by the board, to continue to act until succeeded, who shall have power to discount and purchase bills, notes and other evidences of debt, and to buy and sell bills of exchange not exceeding twelve hundred dollars, except upon their own personal responsibility, and who shall at each regular meeting of the board make a report of the bills and notes discounted and purchased by them since their last previous report."

The defendants offered to prove that for many years a very arge portion of the business of national banks consisted in buying commercial paper, and was not confined to the discounting of such paper, and that, by a uniform and well established usage, the presidents of banks were authorized to and did buy commercial paper for the banks; but the judge refused to admit such testimony.

The defendants further contended, and asked the judge to rule, that if the agreement of September 29 was as testified to by Evans and Whitney, yet that the letter of the cashier of September 30, with the check accompanying it, made a completed sale, by which the bank was bound, and that it could not afterwards rescind such sale; but the judge declined so to rule.

The judge being of opinion that, under the banking laws of the United States, a national bank had no right to buy promissory notes, or, if it had such right, it could only be exercised by the board of directors acting as a board, by consent of parties, before verdict, reported the case to this court.

If the bank could not lawfully buy the notes in question, or could only do so by its board of directors acting as such, and the judge rightly refused to admit the evidence offered, and make the rulings prayed for, a verdict was to be entered for the plaintiff for the amount received by the defendants for the Cox notes · otherwise, the case was to stand for trial.

*C. R. Train & W. C. Loring*, for the plaintiff.

*A. Hemenway*, for the defendants.

LORD, J.   The question, which has been so ably and exhaustively argued by the counsel on each side, to wit, whether it is within the authority of a national bank to purchase a promissory note, in contradistinction to a discounting of it, is one which cannot properly arise in this case.   The action is for money had and received by the defendants to the plaintiff's use.   The answer is a denial that the defendants received the money to the plaintiff's use.   It appears from the facts that the defendants received money of the plaintiff, and the real question in the case is, to whose use did they receive it.   They say they received it to their own use ; that they received it in payment of certain promissory notes sold and delivered by them to the plaintiff.   If this be so, it is immaterial whether the plaintiff had the right to buy or not.   The defendants had a right to dispose of the notes to whomsoever they chose, and if the plaintiff bought them and paid for them, it could not rescind the contract thus fully performed and executed upon the ground that it was a purchase which it had no authority to make, and recover back the money paid upon it.   A corporation, acting without authority, is not in the position with the privileges of an infant to avoid an improvident contract, but in the position and subject to the liabilities and disabilities of a wrongdoer, if it exceeds its authority.   It cannot complete a bargain with a third party, which such third party has a right to make, and then rescind the contract, wholly executed, if such contract proves to be an improvident one, and recover back the consideration.

An embarrassment arises from the fact that by the terms of the report it is agreed that if the court should be of opinion that the bank had no authority to buy the notes in question, and the evidence offered by the defendants was rightly rejected, a verdict should be entered for the plaintiff. We think it entirely clear that there is omitted, by accident, from the report, the most important element, to wit, whether, upon the facts as reported, the plaintiff can avail itself of the want of authority to make the contract alleged by the defendants.

The real controversy between these parties is upon a question of fact. Was there an executed contract between them, of which the transferring of the notes upon the one side, and the payment of the money upon the other, were the respective considerations? If so, the transaction was complete, and the plaintiff cannot rescind and recover back the money paid. If, however, there was no contract between the parties; if the title to the notes had not passed to the plaintiff according to the agreement and understanding between the parties; that is, if the parties to the transaction did not understand the contract to have been made, both parties understanding that it remained wholly at the option of the plaintiff whether to purchase or not, then, whether the contract was one which the plaintiff had authority to make or not, it had not in fact made it; and if it is able to prove that the money went into the defendants' hands upon no consideration and was to be held to the plaintiff's use, unless the plaintiff should determine to consummate the contract, it will be entitled to recover. In this view, it is necessary that the case

*Stand for trial.*